635 So.2d 288 (1994)
Rudy P. BLANCHARD
v.
MEANS INDUSTRIES, INC. and Nicholas Construction Company.
No. 93-CA-715.
Court of Appeal of Louisiana, Fifth Circuit.
March 16, 1994.
*290 Jonathan S. Robbins, Bruce J. Borrello, Borrello, Huber & Dubuclet, Metairie, for defendants-appellants.
Risley C. Triche, Risley C. Triche & Associates, Napoleonville, for plaintiff-appellee.
Before GAUDIN, GRISBAUM and DUFRESNE, JJ.
GRISBAUM, Judge.
This appeal arises out of a personal injury action. After a jury trial, judgment was rendered finding Means Industries, Inc. (Means Industries) and its liability insurer, Liberty Mutual Insurance Company (Liberty Mutual), liable for plaintiff's injuries in the full sum of $460,500.00, together with legal interest from date of judicial demand and for all costs of the proceedings, who now appeal. We affirm.

BASIC RECORD FACTS AND PROCEDURAL HISTORY
On August 23, 1989, Rudy Blanchard, plaintiff, was injured while working at the Agrico Plant (Agrico) in Taft, Louisiana. He was employed by Louisiana Mississippi Terminal Company (LMT) as a foreman.
Agrico had entered into a contract with LMT to perform construction work and maintenance at the plant and to supply labor when it was needed. Agrico had also contracted with Means Industries to dismantle a scrubber at its Luling Monsanto Plant and to erect the scrubber at its Taft Plant. According to the testimony of Tom Means, former president of Means Industries, the company was dissolved in January of 1991. There was no contract between Means Industries and LMT.
On the morning of the accident, Rudy Blanchard received instructions from his supervisor that he was to resume working on the docks. However, later that day, Rudy was sent to assist in the area of the scrubber. According to plaintiff's testimony, Chuck Carr, the supervisor for Means Industries, asked plaintiff to get some railroad cross ties so they could roll a vessel onto the ties and not disturb the nozzles underneath. Rudy and two co-workers, Donald Hebert and O'Neil Trosclair, were carrying cross ties when he injured his back. Blanchard's injury occurred when Hebert and Trosclair dropped their end of the cross tie; however, the plaintiff did not hear them tell him to drop his end of the cross tie. So, when Trosclair and Hebert dropped their end of the cross tie, this left Rudy Blanchard supporting the entire weight. As a result of the accident, plaintiff suffered a ruptured disc. Plaintiff has had two back surgeries and has not worked since.
A trial on the merits was held April 12-14, 1993. The jury found Means Industries 50 percent at fault, LMT 40 percent at fault, and plaintiff ten percent at fault.

ISSUES
We are called upon to determine numerous specific issues, to-wit:
(1) Whether the judgment rendered against Liberty Mutual was erroneous as unsupported by any evidence of record;
(2) Whether the jury erred in its assessment of fault;
(3) Whether the trier of fact erred in awarding future medical damages, along with making an excessive award for wage loss;
(4) Whether the trier of fact erred in excluding the video tape of plaintiff and likewise erred in admitting into evidence items not listed by plaintiff in the pre-trial order; and
(5) Whether the trial court erred in disallowing defendants' requested jury charges on credibility and factors used in evaluating comparative negligence.

ANALYSISISSUE ONE
The defendants argue that the insurance policy was never introduced; thus, there is no evidence in the record of any connection between Liberty Mutual and the occurrence. We disagree on the grounds there is ample evidence of the connection between Liberty *291 Mutual and the occurrence. We disagree on the grounds there is ample evidence of the connection between Liberty Mutual and the occurrence.
First, plaintiff filed a Supplemental and Amending Petition adding Liberty Mutual, which alleged Liberty Mutual had a general liability policy insuring Means Industries from all liability. In its Answer to this Supplemental Petition, the defendant, Means Industries, admitted Liberty Mutual was its insurer.
Second, plaintiff, in brief, points out Liberty Mutual asserted no affirmative defenses in its Answer which would constitute a defense for plaintiff's action or have the effect of defeating plaintiff's demand against Liberty Mutual. We note defendant's Answer must set forth any matter constituting an affirmative defense. See La.Code Civ.P. arts. 1003 and 1005.
Thirdly, Liberty Mutual appeared as a defendant at the trial of this matter, and counsel for Liberty Mutual stated at the trial the insurance company would pay only if its insured is negligent.
Now, the defendant seeks to avoid liability on the theory the insurance policy was never introduced at trial. Defendant relies on the jurisprudence that plaintiff must establish every fact and issue which is essential to his cause of action or right of recovery, including the existence of the policy sued, its terms and provisions, and that claim is within the coverage. See Gulf Wide Towing v. F.E. Wright (U.K.), Ltd., 554 So.2d 1347 (La.App. 1st Cir.1989); Vallery v. All Am. Life Ins. Co., 429 So.2d 513 (La.App. 3d Cir.1983), writ denied, 434 So.2d 1091 (La.1983); and Barber v. Best, 394 So.2d 779 (La.App. 4th Cir. 1981).
We find plaintiff has established at the least a prima facie case regarding the existence and coverage of the insurance policy in question. That is why, pursuant to plaintiff's Motion to Supplement the Record, this Court has admitted discovery material with the attached insurance policy showing the liability insurance coverage issued by Liberty Mutual and providing liability insurance coverage to Means Industries.
The record can be supplemented under the authority of La.Code Civ.P. art. 1474(C)(3), which provides: "When documentation of discovery not previously in the record is needed for appeal purposes, upon application and order of the court, or by stipulation of counsel, the necessary discovery materials shall be filed in the proceedings."
Since plaintiff established a prima facie case of the existence in coverage of Liberty Mutual's policy, we deem the Motion to Supplement the record as necessary for this appeal. This saves the time of remanding the matter for the introduction of the policy. See Hae Woo Youn v. Maritime Overseas Corp., 605 So.2d 187 (La.App. 5th Cir.1992), rev'd on other grounds, 623 So.2d 1257 (La. 1993).
Our examination of the record reveals Liberty Mutual did not contradict or rebut the existence of a liability policy by Liberty Mutual which insures Means Industries. Ergo, we find plaintiff prevails by carrying his burden of proof regarding existence of a policy.

ANALYSISISSUE TWO

THE ASSESSMENT OF FAULT REGARDING MEANS INDUSTRIES

STANDARD OF REVIEW
When viewing our statutory scheme, there is no standard for determining percentages of fault provided by our legislature. See Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985). However, the Louisiana Supreme Court in Watson did suggest guidelines in apportioning fault. These factors include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) significance of what was sought by the conduct, (4) capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.
Importantly, we must be ever mindful that our standard of review regarding apportionment of fault is what we commonly refer *292 to as the Arceneaux review, namely, whether the trial court was clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
We now turn to the record evidence to determine whether the fault assessed is in error. The record shows the following:

FAULT OF MEANS INDUSTRIES
There was an agreement between Means Industries and Agrico that if a Means Industries employee needed help, a Means Industries supervisor was to go to the warehouse and tell someone he needed help and it would be provided. Chuck Car, the Means Industries supervisor in charge of erecting the vessel, did recall asking for help. Although he did not specifically remember moving the cross ties, he did remember there was someone there assisting him.
Rudy Blanchard testified Chuck Car asked him to get the cross ties, in order to put them underneath the vessel.
Al Marks, a safety consultant and certified safety professional, testified regarding the events which took place at the Agrico. Since Means Industries was in charge of erecting the scrubber, Marks testified Car was the person in charge of the operation and that he had the responsibility to make sure there was adequate crew and equipment in the procedures used in moving the ties.
Marks' expert opinion revealed moving the cross ties in such a manner was unreasonable and a violation of safety standards. These standards, according to the National Safety Commission and the National Institute of Occupational Safety, are that the reasonable weight for a worker to carry is 55-65 pounds. If the weight is moved over a distance 10-15 feet, the weight limit drops down to 35 pounds. Marks further testified, whenever anything heavy is moved, it is preferable to use a mechanical device. In this particular situation, tie tongs, an inexpensive piece of equipment, could have been used to move the cross ties.
Based on the foregoing, the jury found Means Industries' failure to provide the sufficient manpower and a safe place to work as actionable negligence. We agree.
More importantly, when viewing the competent evidence the jury possessed, we find it would be foolhardy, at best, for us to second guess the jury's assessment of fault it placed on Means Industries. Nor can we say that its finding was clearly erroneous, based on its reasonable inferences of fact, which should not be disturbed upon review where a conflict exists in the testimony adduced. See Stobart v. State through Dep't of Transp. and Dev., 617 So.2d 880 (La.1993). Ergo, we see no error.

ANALYSISISSUE THREE

(A) Was the $60,000.00 awarded for future medical expenses manifestly erroneous and clearly wrong?
Regarding the award for future medical expenses, we see defendant contends this award was error because Dr. John Jackson's prognosis was that the need for any future surgery would depend on how bad plaintiff's back bothered him. If at some point in the future the pain was unbearable, surgery was a possibility. On cross-examination, the following exchange occurred: "[Q] [S]ir, until you see him again on May 13th, 1993, can you state to a reasonable degree of medical certainty as to whether he will or will not need any further surgery?" Plaintiff points to Dr. Jackson's prognosis:
I'm afraid that he may end up having another operation. But, I'm hoping he won't and it's possible, although I think it's very probable. Usually if a man doesn't fuse by a year and a half or by two years, they're not going to fuse.
The likelihood is that, the probability is that he's not going to fuse, and the likelihood is that he's going to have some discomfort from his back, and it just depends on how bad that is, as to whether he elects to go through another operation to get over that discomfort that is present.
Awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated in setting their probable cost. See Durkee v. City of Shreveport, 587 So.2d 722 (La.App. 2d Cir.1991), writ denied, 590 So.2d 68 (La.1991).
*293 Plaintiff claims Dr. Jackson's testimony establishes the probability that future surgery would be necessary for plaintiff. We cautiously agree, since future medical expenses, our jurisprudence provides, must be established with some degree of certainty, and we find the plaintiff has shown that, more probable than not, these expenses will be incurred.
(B) Was the award of $101,000.00 in past lost wages and $500,000 in loss of future earning and earning capacity excessive because of an incorrect base salary figure?
A reviewing court should not set aside an award of quantum unless an analysis of the facts and circumstances reveal the trial court abused its discretion in setting the award. See Reck v. Stevens, 373 So.2d 498 (La.1979).
Defendant claims the figures used by Dr. Melville Wolfson, plaintiff's economic expert, improperly included plaintiff's business expenses. Defendant contends that subtracting these expenses from the original base figure would result in a new base figure of $22,689.00 as opposed to $27,671.00, the figure which was actually used. This would bring the past total loss wages to $82,861.00, rather than $101,056.00.
However, a close examination of the expert's testimony reveals what the expert actually said was the expenses are deducted from the income tax return; however, it doesn't affect your ability to make more money.
The jurisprudence is clear that gross rather than net income is used when determining lost wages. See Bernard v. Royal Ins. Co., 586 So.2d 607 (La.App. 4th Cir.1991), writ denied, 589 So.2d 1058-59 (La.1991) and Harris v. Tenneco Oil Co., 563 So.2d 317 (La.App. 4th Cir.1990), writ denied, 568 So.2d 1062 (La.1990). Based on the foregoing, we see no abuse of discretion in this award.
(C) Should the future earning and earning capacity loss be further reduced due to plaintiff's failure to mitigate his damages?
Defendants argue the award for future earning and earning capacity should be reduced due to plaintiff's failure to mitigate his damages. Specifically, defendants point to the reason plaintiff's lumbar diskectomy and fusion performed on him in May 1991, which still had not fused by the trial, was partially brought about by plaintiff's failure to stop smoking.
The significance of plaintiff's failure to stop smoking is, according to Dr. Jackson, that smoking can decrease bone growth and, in some case, completely prevent it. The purpose of plaintiff's surgery was to stop the movement of his vertebral bodies by inserting bone blocks which would then grow together with the vertebral bodies whose movement was the source of plaintiff's pain complaints. Bone growth at the fusion site would immobilize the area, thus preventing any movement and the resulting pain.
However, there was no medical testimony that plaintiff's smoking was the reason his bones were not fusing together. There was testimony that plaintiff's continued smoking "could be" the reason the motion at the fusion site was not subsiding. However, Dr. Jackson did testify smoking affects the ability of bones to fuse.
Defendants assert that the plaintiff failed to "take reasonable steps to minimize the damages that are a consequence of the injury." It is a well-established principle of law that a tortfeasor takes his victim as he finds him. However, there is another principle recognized by our jurisprudence that an injured plaintiff has a duty to take reasonable steps to mitigate damages. See Aisole v. Dean, 574 So.2d 1248 (La.1991). The supreme court read these two doctrines together and concluded that although a tortfeasor takes his victim as he finds him at the time of the injury, after that time, the victim has an affirmative responsibility to make every reasonable effort to mitigate his damages. See Aisole, supra.
We know that plaintiff's doctor advised and urged plaintiff to stop smoking after his lumbar diskectomy and fusion in January 1992, and again in July 1992. Plaintiff acknowledged he was told this. Importantly, there is evidence in the form of plaintiff's testimony that he quit smoking for seven *294 weeks; however, he resumed smoking one or two every now and then, even through trial. Plaintiff also contends he was not told about the dangers of smoking until one year after his surgery.
Based on the foregoing principles, we find that this plaintiff, recognizing severity of his smoking addiction, has vastly reduced the number of cigarettes consumed per day; accordingly, his common sense and fortitude addressed the psychological and physical addiction which possesses him, and, ergo, we see no failure on his behalf in failing to mitigate damages.

ANALYSISISSUE FOUR
We now turn to determine whether the trier of fact erred in excluding the video tape of plaintiff and likewise erred in admitting into evidence items not listed by plaintiff in the pre-trial order.
At the end of the second day of trial, defendant sought to introduce into evidence a video tape of the plaintiff taken by a private investigator over the course of several days of the week before trial and up until Sunday, April 11, 1993, which was the day before trial commenced.
The court refused to allow the video tape to be shown to the jury because it had no evidentiary value from an impeachment standpoint. The court further ruled that the tape was not admissible, i.e., it was prejudicial and was not legally admissible because it was not timed and filmed in spurts which made everything run together. After viewing the tape, we agree. See Douglas v. G.H.R. Energy Corp., 463 So.2d 5 (La.App. 5th Cir.1984).
We now turn to the pre-trial order which logically controls a subsequent course of action unless it is modified at trial to prevent manifest injustice. See Sibley v. Menard, 398 So.2d 590 (La.App. 1st Cir. 1980), writ denied, 400 So.2d 211 (La.1981).
Defendants claim the plaintiff failed to list the fact he intended to use a "two-man tie tong" as an exhibit at trial. The first notice defendants received of plaintiff's intention to use the "two-man tie tong" as an exhibit at trial was on April 7, 1993, four days before trial when an amended exhibit list was faxed to defendants' attorneys. The trial court denied defendants' motion in limine to prohibit plaintiff from introducing the tie tong.
The tie tong is a type of tool used when someone is moving anything heavy or bulky to make the job go easier. The evidence was introduced when the plaintiff's expert was on the stand, and he indicated this was the type of tool he referred to in his testimony and what the parties could have used to make the job go easier.
We note that much discretion is left to the trial judge in determining whether to modify the pre-trial order. We find there was no abuse of discretion and no manifest injustice. See Sibley, supra.

ANALYSISISSUE FIVE
We will now determine whether the trial court erred in its jury charges.
Based on our review of the charges, we find the ones regarding credibility of parties and a party's negligence or comparative negligence do fairly and reasonably point out the appropriate issue and provide correct principles of law to guide the jury in its necessary task. Moreover, we find that a review of the pleadings reveals at no time did Means Industries set forth the affirmative defense that plaintiff was a borrowed servant; ergo, the trial court properly excluded this jury charge since the issue was not properly before the court. In the final analysis, we see no error. Plaintiff raises other issues, which we find have no merit.
For the reasons assigned, the trial court's judgment is hereby affirmed. All costs of this appeal are to be assessed against the appellants.
AFFIRMED.